UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-25081-Civ-COOKE/O'SULLIVAN

CANOBINOTI, LLC and
DAVID OCOMO,

Plaintiffs,

v.

RICHARD WOODS, REAL ESTATE
ACQUISITION DEVELOPMENT SALES, LLC
d/b/a READS-HEALTHCARE, LLC,
THE LIONS GROUP, LLC, JAKE YANG,
JO ANN MAKOUS, C&A LOGISTIX, LLC,
NATALIE MAKOUS, and LEAH COX,

Defendants.
_____/

## ORDER GRANTING MOTION TO DISMISS
## DUE TO LACK OF PERSONAL JURISDICTION

**THIS MATTER** is before the Court upon the Motion to Dismiss for Lack of Jurisdiction (the "Motion") (ECF No. 12), filed by Defendants The Lions Group LLC, Jake Yang, JoAnn Makous, C&A Logistix LLC, and Natalie Makous on February 22, 2021. Plaintiffs Canobinoti, LLC and David Ocomo (collectively "Plaintiffs") filed their response in opposition to the Motion on March 8, 2021. ECF No. 22. Defendants The Lions Group LLC, Jake Yang, JoAnn Makous, C&A Logistix LLC, and Natalie Makous (collectively "Defendants") filed their reply in support of the Motion on March 12, 2021. ECF No. 26. Accordingly, the Motion is ripe for adjudication.

The Court having reviewed the Motion, the briefing related thereto, and the relevant legal authorities, finds for the reasons discussed below, that the Motion should be granted.

### BACKGROUND

This case stems from certain alleged transactions surrounding the purchase and sale of Personal Protective Equipment ("PPE"). Plaintiffs filed the Complaint in this action on December 14, 2020. ECF No. 1. Plaintiffs filed the First Amended Complaint (the "FAC") (ECF No. 5), which is the operative pleading in this action, on December 17, 2020. In the

FAC Plaintiffs allege that they leveraged their global connections to connect buyers and sellers of large quantities of PPE products." ECF No. 5, FAC at ¶ 14. This involved Plaintiffs reaching out to well-known and established personal connections as well as sourcing, contacting and verifying the legitimacy of purchasers and sellers of PPE. *Id.*

To protect their proprietary interest in their contacts and to avoid being circumvented after disclosing their contacts, Plaintiff David Ocomo ("Plaintiff Ocomo"), both individually and by and through his wholly owned company, Plaintiff Canobinoti, LLC ("Plaintiff Canobinoti") signed or was otherwise bound by and party to several Non-Circumvention and Non-Disclosure Agreements. *Id.* at ¶ 15. On August 24, 2020, Plaintiffs along with Defendants Richard Woods ("Defendant Richard Woods") and Real Estate Acquisition Development Sales, LLC ("Defendant READS") signed a Mutual Confidentiality and Non-Disclosure Non-Circumvention Agreement (the "August 24, 2020 NCNDA"). *Id.* at ¶ 16. In reliance on the August 24, 2020, Plaintiffs introduced Defendant Richard Woods to a number of potential buyers of large quantities of PPE. *Id.* at ¶ 17. One of these buyers was Defendant The Lions Group, LLC ("Defendant Lions Group"). *Id.* Defendant Richard Woods did not have a pre-existing relationship with Defendant Lions Group until Plaintiffs introduced them to each other. Defendant Richard Woods then reached out to potential purchasers and sellers of PPE, again using Plaintiffs' contacts and connections. *Id.* at ¶ 18. Plaintiffs later introduced Defendant READS and its principal, Defendant Richard Woods, to Defendant Lions Group, Defendant Jake Yang and Defendant Jo Ann Makous. *Id.* at ¶ 19. This introduction and each of Plaintiffs' actions, that took place in August and September 2020, were subject to the terms of the August 24, 2020 NCNDA. *Id.* at ¶ 20. Moreover, the August 24, 2020 NCNDA prohibited Plaintiffs, Defendant Richard Woods, and Defendant READS from disclosing confidential information, including the names or contact information of any contacts, to third parties, and further prohibited its signatories from exploring or undertaking business transactions with any person or entity whose name was provided by any party to the NCNDA without prior written consent. *Id.* at ¶ 20.

On September 24, 2020, Plaintiffs, Defendant Lions Group and Defendant Jake Yang, in both his individual capacity and in his capacity as Chief Executive Officer of Defendant Lions Group, signed a Mutual Confidentiality and Non-Disclosure Non-Circumvention Agreement (the "September 24, 2020 NCNDA"). *Id.* at ¶ 21. The September 24, 2020

NCNDA designated Defendant Jo Ann Makous as the attorney representative for Defendant Lions Group and, therefore, also bound Defendant Jo Ann Makous. *Id.* The September 24, 2020 NCNDA prohibited each of its signatories from disclosing confidential information, including the names or contact information of any contacts, to third parties, and further prohibits its signatories from exploring or undertaking business transactions with any person or entity whose name was provided by any signatory or intended third-party beneficiary to the NCNDA without prior written consent. *Id.* at ¶ 22. After execution of and in reliance on the September 24, 2020 NCNDA, Plaintiffs performed additional work sourcing their connections to broker a transaction for the purchase and sale of PPE. *Id.* at ¶ 23. The parties to the September 24, 2020 NCNDA intended that Plaintiffs' contacts and work product be protected under the September 24, 2020 NCNDA, as set forth under the plain language of the contract. *Id.*

From September 24, 2020 forward, Plaintiffs continued spearheading detailed discussions, along with high level strategic decisions and detail-oriented work to bring a transaction for billions of boxes of PPE to fruition. *Id.* at ¶ 24. Plaintiffs' efforts included identifying buyers seeking billions of boxes of Cranberry Evolve Nitrile Gloves, including Defendant Lions Group. *Id.*

On September 24, 2020, Defendant Jo Ann Makous sent Plaintiff Ocomo a Letter of Attestation ("LOA") on behalf of Defendant Lions Group, which certified that Defendant Lions Group had sufficient funds available for the purchase and funding of 2.5 billion boxes of Cranberry Nitrile Gloves. *Id.* at ¶ 25. On that same date, Defendant Lions Group provided Plaintiff Ocomo with a Letter of Intent ("LOI") indicating that it was ready, willing and able to purchase 2.5 billion boxes of Cranberry Nitrile Gloves along with a Purchase Order for this quantity of PPE. *Id.* at ¶ 26. Based on the Letter of Attestation, Letter of Intent, and Purchase Order, Plaintiffs and Defendant READS, through its principal, Defendant Richard Woods, continued to proceed with securing a seller for 2.5 billion boxes of Cranberry Nitrile Examination Gloves. *Id.* at ¶ 27. In particular, Plaintiffs sent the LOA and LOI addressed to Plaintiff Ocomo to Defendant READS and Defendant Richard Woods, pursuant to the terms of the August 24, 2020 NCNDA. *Id.* at ¶ 28. In addition, after these efforts concerning the purchase and sale of 2.5 billion boxes of Cranberry Nitrile Gloves, Plaintiffs used their well-

sourced connections to explore and consummate another transaction for the purchase and sale of 2 billion boxes of Cranberry Nitrile Gloves. *Id.* at ¶ 29.

Defendants Jake Yang, Lions Group, and Jo Ann Makous signed additional LOAs and LOIs, which Defendant READS and/or Defendant Richard Woods forwarded to a seller group which included Defendant IANUA Market and its co-founder, Defendant Leah Cox, as well as Eric Brady, Maury Lyon and an individual named Brandon. *Id.* at ¶ 30. At all material times, Defendant Leah Cox acted with the express and implied authority of Defendant IANUA Market. *Id.* at 31. Moreover, Defendant Leah Cox undertook all actions alleged herein to further the subject transaction(s) by and on behalf of Defendant IANUA Market. *Id.*

Upon information and belief, at the end of September and beginning of October 2020, Defendants began an orchestrated effort to circumvent Plaintiffs and consummate a transaction while excluding Plaintiffs. *Id.* at ¶ 36. In or around September or early October 2020, Defendant READS and its principal, Defendant Richard Woods, directly contacted Defendants Lions Group, Jake Yang, and/or Jo Ann Makous to consummate a transaction for the purchase and sale of Cranberry Nitrile Examination Gloves. *Id.* at ¶ 37. These communications were made without Plaintiffs' knowledge and/or consent. *Id.* In or around September or early October 2020, Defendants Lions Group, Jake Yang, and/or Jo Ann Makous also directly communicated with the seller group including Defendant IANUA Market and its co-founder, Defendant Leah Cox, as well as Eric Brady, Maury Lyon and an individual named Brandon, again to consummate a transaction for the purchase and sale of Cranberry Nitrile Examination Gloves. *Id.* at ¶ 38. These communications were made without Plaintiffs' knowledge and/or consent. *Id.* Moreover, throughout September and October 2020, Defendants took repeated, continuous and intentional overt acts to circumvent Plaintiffs and use Plaintiffs' contacts, connections and work product to close one or multiple transactions for the purchase and sale of PPE, all while using the same or substantially similar LOAs and LOIs prepared by, commented on, and circulated by Plaintiffs to Defendants Richard Woods, READS, Lions Group, Jo Ann Makous, Natalie Makous, and C&A Logistix. *Id.* at ¶ 39.

Upon information and belief, Defendant Lions Group ultimately took actual or constructive possession of billions of boxes of medical gloves from the seller group including

Defendant IANUA Market and its co-founder, Defendant Leah Cox, as well as Eric Brady, Maury Lyon and an individual named Brandon, without including or otherwise compensating Plaintiffs. *Id.* at ¶ 41. Upon information and belief, Defendant Lions Group and the remaining Defendants also furthered this and other transactions based on Plaintiffs' contacts, connections and hard work. *Id.* at ¶ 42. This actual or constructive possession, or benefit to Defendants, would not have occurred but for Plaintiffs' contacts, connections and hard work. *Id.* at ¶ 43.

Based upon the above allegations, Plaintiffs assert five claims for breach of contract against each of the five Defendants, separately (*See* Counts I through V); a single claim for unjust enrichment against all of the Defendants (Count VI); a claim for violation of Florida's Unfair and Deceptive Trade Practices Act ("FDUPTA") against all Defendants (Count VII); and a claim for civil conspiracy against all Defendants (Count VIII).

In their Motion, Defendants argue: 1) a binding arbitration agreement between the Parties compels that this matter be resolved through arbitration and therefore this Court lacks jurisdiction[1]; 2) there is a lack of complete diversity to support the Court's exercise of diversity jurisdiction; and 3) the amount in controversy in this case does not support diversity jurisdiction. Because the Court finds that this action is governed by a binding arbitration agreement, the Court will not reach Defendants' diversity jurisdiction arguments.

## LEGAL STANDARD

There is an "emphatic federal policy in favor of arbitral dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631 (1985). The Federal Arbitration Act (the "FAA") governs the validity of an arbitration agreement. *Bhim v. Rent-A-Center, Inc.*, 655 F. Supp. 2d 1307, 1309 (S.D. Fla. 2009) (citation omitted). The FAA requires "that [courts] rigorously enforce agreements to arbitrate.'" *Davis v. Prudential Sec., Inc.*, 59 F.3d 1186, 1192 (11th Cir. 1995) (alteration in original) (quoting *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987)). "Pursuant to the Federal Arbitration Act, a written arbitration provision in a 'contract evidencing a transaction involving commerce' is 'valid,

---

[1] The Court shall construe Defendants' Motion to be a motion to compel arbitration as opposed to a motion to dismiss for lack of subject matter jurisdiction. Defendants arguments are geared towards compelling arbitration not outright dismissal. Moreover, the Court finds that compelling arbitration is the better course of action.

irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Herrera Cedeno v. Morgan Stanley Smith Barney, LLC*, 154 F. Supp. 3d 1318, 1323 (S.D. Fla. 2016) (quoting 9 U.S.C. § 2). To that end, "the FAA provides that a court must either stay or dismiss a lawsuit and compel arbitration upon a showing that '(a) the plaintiff entered into a written arbitration agreement that is enforceable 'under ordinary state-law' contract principles and (b) the claims before the court fall within the scope of that agreement.'" *Compere v. Nusret Miami, LLC*, 396 F. Supp. 3d 1194, 1198–99 (S.D. Fla. 2019) (citing *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008) (quoting 9 U.S.C. §§ 2–4)).

In accordance with this policy, courts must construe "any doubts concerning the scope of arbitrable issues ... in favor of arbitration." *Mitsubishi*, 473 U.S. at 626 (citation omitted). "Thus, the party opposing arbitration has the burden, 'not unlike that of a party seeking summary judgment,' of showing why the court should not compel arbitration. *Compere*, 396 F. Supp. 3d at 1199 (quoting *Bhim*, 655 F. Supp. 2d at 1311 (citations omitted)). "However, the party seeking to compel arbitration has the initial burden of 'producing the [a]rbitration [a]greement and establishing the contractual relationship necessary to implicate the FAA and its provisions granting this Court authority to dismiss or stay Plaintiff's cause of action and to compel arbitration.'" *Id.* (quoting *Fantis v. Flywheel Sports, Inc.*, No. 18-24934-CIV-UNGARO/O'SULLIVAN, 2019 WL 1582957, at *2 n.2 (S.D. Fla. Mar. 11, 2019) (citations omitted), report and recommendation adopted, No. 18-CV-24934-UU, 2019 WL 2245417 (S.D. Fla. Apr. 29, 2019), appeal dismissed, No. 19-11690-GG, 2019 WL 5598342 (11th Cir. Oct. 22, 2019). "Thus, with respect to the threshold question of whether an [arbitration] agreement between the parties exists at all, the initial burden is on the defendant to prove the existence of a contract by a preponderance of the evidence." *Id. see also Hicks v. Comcast Cable Commc'n. LLC*, No. 18-CV-61384, 2018 WL 6573121, at *4 (S.D. Fla. Dec. 13, 2018) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). "Whether a valid agreement to arbitrate exists is a matter of state contract law." *Compere*, 396 F. Supp. 3d at 1199. *See also Emp'rs Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2001) (citation omitted) ("[f]ederal law establishes the enforceability of arbitration agreements, while state law governs the interpretation and formation of such agreements."). "When in doubt, questions of arbitrability should be resolved in favor of arbitration." *McDougal v. Comcast Corp.*, No. 16-81906-CIV, 2017 WL 3726040, at *2 (S.D. Fla. Feb. 24, 2017) (citing

*Moses H. Cone Mem'l Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)). "Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Emp'rs Ins. of Wausau*, 251 F.3d at 1322.

## ANALYSIS

As previously mentioned, in their Motion, Defendants argue that this action is governed by a binding arbitration agreement. In support of this argument, Defendants provided the Court with a copy of a thirteen-page document which at the top of the very first page shows the title of the document as being the *Non-Circumvention, Non-Disclosure, & Working Agreement (NCNDA) - Irrevocable Master Fee Protection Agreement (IMFPA)*. ECF No. 10-2 at p. 2. The document is dated October 1, 2020. *Id.* It describes "The Product" as "2,500,000,000 (300 ct.) Cranberry Evolve Nitrile Gloves". *Id.* It further reflects that Plaintiff Canobinoti, LLC, through Plaintiff Ocomo, executed it on October 3, 2020. *Id.* at p. 11. Likewise, it reflects that Defendants also executed it on October 3, 2020. *See id.* at pp. 8, 11, and 12. And the "Buyer/Payor" is identified as being Defendant Lions Group. *Id.* at p. 2. The footer of each page of the document reflects that it is entitled, *Irrevocable Master Fee Protection Agreement & NCNDA*. *See id.* at pp. 2-13. To be clear, the document, starting on page two, appears to break the IMFPA and the NCNDA into two different agreements that are positioned vertically side-by-side with the text of the IMFPA portion being in a light green background while the text of the NCNDA portion is in a light Blue background. *See id.*

The October NCNDA appears to relate to define the parameters of the business relationship between the Parties including confidentiality provisions as to the Parties' sources and contacts. *See id.* at p. 3. Meanwhile, the IMFPA appears to relate to the commissions, consultancy fees, and other fees that Buyer/(Defendant Lions Group) was required to pay to the intermediaries as part of the transactions between the Parties. *See id.* The document identifies the intermediaries as follows: Sell Side Beneficiary (Intermediary 1) is Defendant READS with Defendant Richard Woods serving as its representative; Buy Side Beneficiary (Intermediary 2) is Defendant C&A Logistix, LLC with Natalie Makous serving as its representative; Beneficiary 3 (Intermediary 3) is Defendant READS with Defendant Richard Woods serving as its representative; Beneficiary 4 (Intermediary 4) is non-party Law Office of Henry M. Cosey with Henry M. Cosey, Attorney at Law, serving as its representative; Beneficiary 5 (Intermediary 5) is Plaintiff Canobinoti LLC with Plaintiff Ocomo serving as

its representative; and Beneficiary 6 (Intermediary 6) is non-party Reliant Consulting Group with Liana Millhouse serving as its representative.

Importantly, the IMFPA has an arbitration clause which states:

> All parties agree to refer any disputes between the parties ***arising out of or in connection*** with this agreement including any questions regarding its existence, validity or termination to arbitration rules of the international arbitration centre (I.A.C). The appointed arbitrator shall hold the proceedings in any country chosen by the beneficiary parties and the rules of the IAC shall apply.

*Id.* at p. 5 (emphasis added).

Plaintiffs argue that the arbitration clause is not applicable to the present action because "Defendant[s] cannot compel arbitration as to claims arising under two contracts that predate the IMFPAs – which do not include **any** arbitration provision whatsoever – or claims based on conduct that predates and therefore does not arise out of the IMFPAs." ECF No. 22 at p. 6. To support their arguments, Plaintiffs rely upon *Thomas v. Carnival Corp.*, 573 F.3d 1113, 1116-17 (11th Cir. 2009); *Carter v. Doll House II, Inc.*, 608 F. App'x 903, 904 (11th Cir. 2015) and *Rodriguez v. Royal Caribbean Cruises, Ltd.*, No. 09-21214-CIV, 2009 WL 10669106, at *3 (S.D. Fla. Sept. 30, 2009), report and recommendation adopted sub nom. *Rodriguez v. Royal Caribbean Cruises, Ltd.*, No. 09-21214-CIV, 2010 WL 11505133 (S.D. Fla. Feb. 26, 2010)[2]. Contrary to Plaintiffs' contentions, however, these cases are not on all fours with the present action.

---

[2] *Rodriguez v. Royal Caribbean Cruises* involved a report and recommendation from a U.S. Magistrate Judge recommending to the Undersigned that a case be remanded to state court due to the defendant's waiver of an arbitration clause. There Judge Bandstra stated "[i]n short, the undersigned concludes that defendant's active participation in state court for almost two years coupled with significant discovery on the merits resulted in prejudice to plaintiff in terms of delay and incurred litigation expenses. As a result, the undersigned finds that defendant has waived its right to arbitration." *Rodriguez v. Royal Caribbean Cruises, Ltd.*, No. 09-21214-CIV, 2009 WL 10669106, at *3 (S.D. Fla. Sept. 30, 2009), report and recommendation *adopted sub nom. Rodriguez v. Royal Caribbean Cruises, Ltd.*, No. 09-21214-CIV, 2010 WL 11505133 (S.D. Fla. Feb. 26, 2010). This is not anlogous to the issues presented in the case at bar. As such, it is unclear as to why Plaintiffs would attempt to rely upon this case to support their argument that the arbitration clause in the IMFPA does not apply. Defendants have not acted inconsistently with their right to arbitrate. Defendants filed the present Motion within a few months of Plaintiffs' filing of the FAC. And the Parties have not engaged in extensive discovery in this case. In fact, there are only forty-seven docket entries in this case to date. As such, the Court finds that Defendants have not waived their right to arbitrate.

For example, *Thomas v. Carnival Corp.* involved negligence claims stemming from a slip and fall accident brought by a waiter on a cruise ship. 573 F.3d at 1115-1116. There, Carnival sought to compel arbitration based upon an arbitration clause contained in a Seafarer's Agreement that the plaintiff executed almost one year *after* the alleged slip and fall incident. Similarly, *Carter v. Doll House II, Inc.* involved the retroactive application of an arbitration clause to FLSA claims brought by multiple plaintiffs where some of the claims arose months or even years prior to the execution of the arbitration clause. *Carter v. Doll House II, Inc.*, 69 F. Supp. 3d 1351, 1353 (N.D. Ga. 2014), aff'd in part, vacated in part, remanded, 608 F. App'x 903 (11th Cir. 2015). This is not the situation presented in this case.

Here, based upon Plaintiffs' own allegations and the Exhibits to the FAC, it is apparent that the Parties executed NCNDAs on August 24, 2020 and September 24, 2020. ECF No. 1, FAC at ¶¶ 16, 24; ECF No. 1-2, Exhibit A (August 24, 2020 NCNDA); ECF No. 1-3, Exhibit B (September 24, 2020 NCNDA). Thus, the August 2020 NCNDA and the September 2020 NCNDA were executed within weeks of the Parties executing the IMFPA which again was side-by-side with the October NCNDA agreement. More importantly, however, is the fact that by Plaintiffs' own allegations, at least, some of the alleged breaches of the NCNDAs occurred after the execution of the IMFPA. More specifically, Plaintiffs' plainly allege that "at the end of September and ***beginning of October 2020***, Defendants began an orchestrated effort to circumvent Plaintiffs and consummate a transaction while excluding Plaintiffs." ECF No. 1, FAC at ¶ 36 (emphasis added). Similarly, Plaintiffs allege "[i]n or around September or ***early October 2020***, READS and its principal, Richard Woods, directly contacted the Lions Group, Jake Yang and/or Jo Ann Makous to consummate a transaction for the purchase and sale of Cranberry Nitrile Examination Gloves. These communications were made without Plaintiffs' knowledge and/or consent." *Id.* at ¶ 37 (emphasis added). Plaintiffs also allege:

> In or around September ***or early October 2020***, the Lions Group, Jake Yang and/or Jo Ann Makous also directly communicated with the seller group including IANUA Market and its co-founder, Leah Cox, as well as Eric Brady, Maury Lyon and an individual named Brandon, again to consummate a transaction for the purchase and sale of Cranberry Nitrile Examination Gloves. These communications were made without Plaintiffs' knowledge and/or consent. Moreover, ***throughout September and October 2020***, Defendants took repeated, continuous and intentional overt acts to circumvent Plaintiffs and use Plaintiffs' contacts, connections and work product to close one or multiple transactions for the purchase and sale of PPE, all while using the same or

> substantially similar LOAs and LOIs prepared by, commented on, and circulated by Plaintiffs to Defendants Richard Woods, READS, Lions Group, Jo Ann Makous, Natalie Makous and C&A Logistix.

*Id.* at ¶¶ 38-39 (emphasis added). Accordingly, Plaintiffs allege that breaches of the NCNDAs occurred in or around October. Meanwhile, the Parties executed the IMPFA on October 3, 2020. As a result, based upon Plaintiffs' own allegations, at least, some of the alleged breaches of the NCNDAs occurred after the execution of the IMPFA.

Moreover, notwithstanding Plaintiffs' suggestion that some of the alleged breaches may have pre-dated the arbitration clause, the Court finds that all of Plaintiffs' claims fall within the arbitration provision. Again, the arbitration provision contained within the IMPFA provides:

> All parties agree to refer any disputes between the parties ***arising out of or in connection with this agreement*** including any questions regarding its existence, validity or termination to arbitration rules of the international arbitration centre (I.A.C). The appointed arbitrator shall hold the proceedings in any country chosen by the beneficiary parties and the rules of the IAC shall apply.

ECF No. 10-2 at p. 5. The Eleventh Circuit has "consistently held that such language is broad in scope." *Northrop & Johnson Yachts-Ships, Inc. v. Royal Van Lent Shipyard, B.V.*, 855 F. App'x 468, 473 (11th Cir. 2021) (citing *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009) (holding that a provision that covered "all disputes arising out of or in connection with" an agreement was "clearly meant to be read broadly"); *Gregory v. Electro-Mech. Corp.*, 83 F.3d 382, 386 (11th Cir. 1996)). Further, "[w]hen faced with a broadly worded arbitration clause, the Court 'should follow the presumption of arbitration and resolve doubts in favor of arbitration.'" *Cheruvoth v. SeaDream Yacht Club, Inc.*, No. 1:19-CV-24416, 2020 WL 6263013, at *5 (S.D. Fla. Oct. 22, 2020) (quoting *Mercury Telco Grp., Inc. v. Empresa De Telecommunicaciones De Bogota S.A. E.S.P.*, 670 F. Supp. 2d 1350, 1355 (S.D. Fla. 2009) (citations omitted)). Here, the purported breaches all involve the same transaction or deal. Namely, the alleged purchase and distribution of PPE. Likewise, the alleged breaches that Plaintiffs argue pre-date the execution of the arbitration agreement center around the provisions within the IMPFA and its accompanying NCNDA. The Court therefore finds these alleged breaches to be connected to the IMPFA. Further, this Court must follow the presumption of arbitration and resolve doubts in favor of arbitration. As such, the Court finds

that the Parties must arbitrate this dispute. Therefore, it is **ORDERED and ADJUDGED** as follows:

1. Defendants' Motion to Dismiss for Lack of Jurisdiction (ECF No. 12) is **GRANTED**. However, the Court declines to dismiss this action with prejudice. Instead, the Parties are directed to arbitrate this matter in accordance with the terms of the IMPA. *As such, the Parties are directed to file a joint status report with this Court, every 180 days, advising as to the status of the arbitration proceeding.*

4. The Clerk of Court is directed to **CLOSE** this case for administrative purposes only, and without prejudice to the parties moving to re-open the case once the arbitration has been completed.

5. All pending motions, with the exception of the Motion to Dismiss for Lack of Personal Jurisdiction (filed by Defendants Leah Cox and Iuana Market Ltd.), not otherwise ruled upon herein are **DENIED AS MOOT**.

**DONE and ORDERED** in Chambers at Miami, Florida this 30th day of September 2021.

MARCIA G. COOKE
United States District Judge

*Copies furnished to:*
*The Honorable John J. O'Sullivan, Chief U.S. Magistrate Judge*
*All counsel of record*